IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BLAKE ALAN RIPPLE, | ) | CV. NO. 1:12-CV-827-DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MARBLE FALLS INDEPENDENT | ) | |
| SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART
<u>DEFENDANT'S EVIDENTIARY OBJECTIONS</u>

On January 23, 2015, the Court held a hearing on a Motion for

Summary Judgment filed by Defendant Marble Falls Independent School District

("Defendant") ("Mot.," Dkt. # 31.).  Martin J. Cirkiel, Esq., represented Plaintiff

Blake Alan Ripple ("Plaintiff" or "Ripple"); Bridget Robinson, Esq., represented

Defendant.  After careful consideration of the memoranda in support of and in

opposition to the Motion, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **GRANTS** Defendant's Motion for Summary

Judgment (Dkt. # 31.).  In accordance with this ruling, the Court **GRANTS IN**

1

**PART** and **DENIES IN PART** Defendant's Objections to Plaintiff's Evidence in Opposition to Defendant's Motion for Summary Judgment (Dkt. # 39).

<u>BACKGROUND</u>

I.    <u>Factual Background</u>

In Fall of 2007, Ripple began his freshman year at Marble Falls High School in Marble Falls Independent School District.  (<u>See</u> "Blake Aff.," Dkt. # 37, Ex. 1 ¶ 4; Mot., Ex. 2-1 at 1–3.)  Throughout his high school career, he participated in the Marble Falls High School Football team, which was a voluntary, extracurricular activity.  (Blake Aff. ¶ 1; Mot., Exs. 2-1, 2-2, 2-3, 2-4, 6 ¶ 4.)  For the duration of his time on the team, Athletic Director Cord Woerner ("Woerner") served as the Head Football Coach and Brandon Belk ("Belk") served as one of two athletic trainers, licensed by the state to assess and treat student medical issues.  ("Woerner Aff.," Mot., Ex. 2 ¶ 2; "Belk Aff.," Mot., Ex. 4 ¶¶ 2–3.)

To join the football team, Marble Falls students are required to submit a "Preparticipation Physical Evaluation—Medical History" form (the "Form") prior to each season.  (Woerner Aff. ¶ 7; Belk Aff. ¶ 4.)  The form has two parts: a medical history portion, which the student and parent fill out, and a physical examination portion, which a health care professional fills out.  (Belk Aff. ¶ 4.)  Incoming Freshmen and third-year students are automatically subject to the physical examination.  (<u>Id.</u>)  The other students need only obtain the physical examination if

a parent marks "yes" to certain medical history questions.  (Id.)  The physical examination portion of the Form requires the health care professional to determine whether the student is "cleared" to participated in sports without restrictions, "cleared after completing evaluation/rehabilitation" for particular medical issues, or "not cleared."  (Id.)  A student who is not cleared cannot participate in athletic practices, games, or matches of any kind.  (Id.)

In accordance with the football program's requirements, Ripple submitted the Form in the summer before each football season.  (See Mot., Exs. 2-1, 2-2, 2-3, 2-4; Woerner Aff. ¶ 7.)  On the Form he submitted prior to his Freshman season, Ripple indicated that he experienced racing heart/skipped heartbeats and high blood pressure/cholesterol and that he had a family history of heart problems and heart-related death.  (Mot., Ex. 2-1 at 1.)   In August 2007, a health care professional cleared Ripple contingent to a follow-up appointment with his family physician regarding his high heart rate and blood pressure.  (Mot., Ex. 2-1at 2.) Children's Cardiology Associates subsequently cleared him to play with no restrictions.  (Id. at 3.)  Although Ripple was cleared, Belk assisted in monitoring Ripple's blood pressure regularly during athletic activities that school year.  (Belk Aff. ¶ 6.)  Ripple does not allege that any concussions occurred during his Freshman season.

In August 2008, Ripple underwent a physical examination following the submission of the Form due to the affirmative nature of various answers on the Form's medical history section.  (Belk Aff. ¶ 7; Mot., Ex. 2-2 at 2.)  In addition to the questions to which Ripple answered "yes" the year before, he also indicated that he experienced exercise-related chest pain, he tired more quickly than his friends during exercise, he had become ill from exercising in the heat, he had become dizzy during or after exercise, he had become unexpectedly short of breath with exercise, and a physician had previously denied him participation in sports for heart problems.  (Mot., Ex. 2-2 at 1.)  His doctor cleared him without restriction for the year.  (Id. at 2.)  In October 2008, Ripple also underwent a Hypertrophic Cardiomyopathy (HCM) screening, after which the physician concluded that there was no evidence for HCM.  (Id. at 3.)  Ripple does not allege that any concussions occurred during his Sophomore season.  However, Ripple did experience two injuries that year: he hyperextended his leg in January 2009 at a football game and tore his right meniscus in January or February 2009 playing touch football.  (Belk Aff. ¶ 8; "Blake Dep.," Mot., Ex. 9 at 60:8–61:16.)

In July 2009, Ripple underwent a third physical examination following the submission of the Form.  (Mot., Ex. 2-3 at 2.)  In addition to the questions to which Ripple answered "yes" the year before, he also indicated he had a medical illness or injury since his last check-up; he had a stinger, burner, or pinched nerve;

he had skin problems; and that he had problems with his knee and ankle.  (Id. at 1.)
The doctor cleared him without restriction for the year.  (Id. at 2.)

Ripple attests that he was not fitted for a helmet in anticipation of his
Junior year, so he received a helmet that did not fit him when he returned to practice
that year.  (Blake Aff. ¶ 10.)  He further attests that during an early-October 2009
game, his head caused him significant pain.  (Id. ¶ 11; Blake Dep. 63:22–65:12.)
After he told Belk that his head was pounding, he was nauseous, and he felt dizzy,
he accidentally asked Belk for a Midol instead of a Tylenol.  (Id.)  Ripple attests that
Belk asked him if it hurt a lot; Ripple replied that it did not.  (Blake Dep.
64:15–17.)  Ripple attests that Belk gave him Tylenol and instructed him to lay
down and rest on the trip home.  (Id. at 64:19–21.)  Ripple attests that he did not tell
his parents about this injury or see a doctor in response.  (Id. at 64:22–65:5.)

On October 23, 2009, Ripple played in game against Lampasas (the
"Lampasas Game").  (Blake Aff. ¶¶ 12–16; Blake Dep. 63:18; Belk Aff. ¶ 10.)
During the last few minutes of the game, Ripple sustained a head injury.  (Blake
Aff. ¶ 13; Belk Aff. ¶ 10.)  After a coach called him off the field, he spoke with his
teammate Jacob Cernosek on the sideline, who said that he needed to see the trainer
immediately.  (Blake Aff. ¶ 14; Blake Dep. 75:5–6.)  Ripple then spoke with Belk
on the sidelines and told him that his head was pounding, his ears were ringing, and

he felt dizzy and nauseous.[1]  (Blake Dep. 76:1–3.)  Ripple does not remember what

Belk said in response, but recalls that Belk then walked away.  (Blake Dep. 76:4–8.)

Ripple did not play any more plays in that game, and returned to the locker room.

(Id. at 76:9–11.)  His parents took him to the hospital, where Ripple attests that the

doctor diagnosed him with a concussion.  (Id. at 75:12–16; Blake Aff. ¶ 16.)  Belk

attests that when he called Ripple's parents the next to follow-up on the injury, they

informed him that he had sustained a concussion.  (Belk Aff. ¶ 11.)  Ripple did not

play in any other games that season.  (Id. ¶ 12; Blake Aff. ¶ 18.)   Following the

injury, he continued to experience headaches, nausea, and involuntary shaking on

his right side like a tremor.  (Blake Aff. ¶ 18.)  On October 26, 2009, Ripple's

parents took him to see his general practitioner, who referred him to a neurologist

for follow-up care.  ("Lori Aff.," Dkt. # 37, Ex. 2.)

In December 2009, Ripple was involved in a car accident, after which

he was taken to the hospital.  (Blake Aff. ¶ 21.)  Although the accident had no

impact on the concussion, Ripple attests that a CAT scan revealed nodules on his

---

[1] Belk attests that Ripple told him that he did not feel well, Belk asked him if the noise was bothering him, Ripple replied that it was, and Belk walked with Ripple down the sideline farther from the noise.  (Belk Aff. ¶ 10.)  At that point, Belk had to attend to the rest of his duties and he monitored the other players.  (Id.)  After the game, he walked with Ripple back to the locker rooms, while Ripple continued to complain of problems with his head.  (Id.)  He attests that he then spoke with Ripple's parents and agreed with them that it would be good to take him to the hospital for evaluation.  (Id.)  Belk did not accompany them because he was responsible for driving several student trainers back to Marble Falls.  (Id.)

thyroid, which he had surgically removed on March 12, 2010. (<u>Id.</u> ¶¶ 21–22.)

Following the surgery, Ripple received Homebound Services to ensure he would be

able to continue his education while he was recovering from the surgery at home.

(<u>Id.</u> ¶ 46.) He attests that the school frequently sent work home with vague

instructions or instructions that required his presence in class to understand or to

participate. (<u>Id.</u> ¶ 47.) He further attests that "on numerous occasions" the school

did not give him any work. (<u>Id.</u>)

      Ripple attests that during Spring 2010, he began to receive recruiting

letters from Division 1 colleges interested in his football ability, but that Woerner

withheld the letters until he began summer training in August. (<u>Id.</u> ¶ 24.) He also

attests that he received treatment at the Mayo Clinic in Rochester, Minnesota in late

May 2010. (<u>Id.</u> ¶ 25.) When he returned from the Mayo Clinic, he returned to a

local doctor for follow-up care, who indicated that he should "take it slow and not

run too much" in the coming football season. (<u>Id.</u>¶ 26.)

      In July 2010, Ripple filled out the Form in anticipation of his Senior

season. (Mot., Ex. 2-4 at 1.) In addition to the questions to which Ripple answered

"yes" the year before, he also indicated that he had been hospitalized overnight in

the past year, he had experienced numbness and tingling in his arms/hands/legs/feet,

he was missing a paired organ, and that he had one previous concussion that

occurred on October 23. (<u>Id.</u>) Due to his responses, he underwent a physical

examination and was cleared without restriction to participate in the 2010–11 football season.  (Id. at 2.)

Ripple's mother, Lori Ripple ("Lori"), attests that she met with Woerner before practice began to explain Ripple's medical limitations.  ("Lori Aff.," Dkt. # 37, Ex. 2 ¶ 18.)  She further attests that Woerner told her that if Ripple could not perform at 110%, he did not want him on the team.[2]  (Id.)  Belk attests that, based on conversations with Lori, he understood that Ripple's parents wanted him to take it slow in order to build up his conditioning.  (Belk Aff. ¶ 15.)  Belk attests that, as a result, the staff permitted Ripple to sit out of preseason two-a-days and was allowed to sit out or take breaks whenever he needed.  (Id.)

Ripple attests that sometime in August 2010, the team was running very hard at a Monday practice.  (Blake Dep. 38:18–22.)  Because the players "kept messing up" during practice, the coaches kept "running [the team] harder and harder."  (Id. at 38:18–41:24.)  When the practice concluded, two of Ripple's teammates suggested that the team run "three more perfect" 40-yard dashes "to get it right and show that [they] were a team."  (Id.)  Even though Ripple didn't want to run because he was tired, he and the rest of the team ran the three additional dashes

_____

[2] Woerner attests that Lori spoke with him on numerous occasions, but never told him about any medical restrictions and instead complained to him that he was not allowing Ripple enough play time during the games, which she felt was necessary for him to receive an athletic scholarship to college.  (Woerner Aff. ¶ 11.)

while the entire coaching staff watched.  (Id.)  Although the coaches gave the team

water breaks throughout this practice, Ripple did not drink water during those

breaks.  (Id. at 43:20–44:13.)  When Ripple reached the locker room, he began

bleeding out of his nose; when he reached his home, he began bleeding out of his

ears and his nose.  (Id.)  When the symptoms continued into the following day, he

went to the emergency room, where the doctor told him that he was severely

dehydrated.  (Id. at 37:1–25.)  The doctor and his neurologist concluded that he

should sit out that week's game, which he did.  (Id. at 38:5–9.)

       Ripple attests that throughout the season, any hits he took to his head

caused him a small headache, a migraine, or ringing in his ears.  (Blake Dep.

96:6–9.)  He attests that he mentioned the issue to Belk briefly in Belk's office at the

beginning of the season, telling him that every time he "la[id] a big hit," his head

would "rattle," his ears would ring, and he would experience a headache.  (Id.

96:23–98:1.)  He attests that Belk asked him if he needed to stop, but he replied that

he did not because he wanted to get a college scholarship.  (Id.)

       Ripple attests Belk brought up the issue with him again the following

week in the training room.  (Id. at 98:2–99:18.)  He attests that Belk asked him if the

hits were getting any worse or better and that he replied that they were the same.

(Id.)  Belk also asked Ripple if he wanted to stop or tell the doctor, and Ripple told

him that he wanted to keep going.  (Id.)

Sometime in October of his senior year, Ripple lost consciousness for about ten seconds while sitting down on the bench after taking a hit to the head. (Id. at 76:17–78:17.) He told Belk and Belk told him to sit out for the remainder of the game. (Id.) Ripple did not return to the game that day. (Id.) Although he told his parents that his head hurt, he did not go to the doctor because he throughout it would ruin the chances of getting a college scholarship. (Id.)

Sometime in October of his senior year, Ripple also experienced a leg injury resulting from a blood clot on his leg, which caused him to miss the game during which he sustained the injury and the game the following week. (Blake Dep. 52:10–56:4.) Although the injury continued to cause him pain, a doctor cleared him to play with a wrap or tape for support. (Id.; Mot., Ex. 2-6 at 4–6.)

Ripple attests that he continued to experience headaches, nausea, vertigo, and loss of sensation on the left side of his body throughout his senior year. (Blake Aff. ¶ 38.) Midway through the season, Ripple told his doctor about the headaches, nausea, vomiting, dizziness, and tingling, and his doctor told him to tell him if there was anything serious to report it immediately. (Blake Dep. 99:23–100:12.) Ripple played through the conclusion of the season in November 2010. (Belk Aff. ¶ 20.)

In March 2011, Ripple had surgery to remove his enlarged tonsils. (Blake Aff. ¶ 42.) From April to May 2011, Ripple again received Homebound

10

Services, which continued through the end of his Senior year.  (Mot., Ex. 8 ¶ 7.)  He attests that he did not receive the same educational programming as his nondisabled peers, he was not given notice of extracurricular activities, and he received no accommodations for the TAKS or ACT tests.  (Blake Aff. ¶¶ 49–50.)  Finally, he attests that he was informed that he could not attend his school functions while he received Homebound services, causing him to miss his Junior and Senior proms.  (Id. ¶ 53.)

II.     Procedural Background

        On September 7, 2012, Plaintiff filed a Complaint, naming Marble Falls Independent School District ("the District") and Woerner as Defendants.  (Dkt. # 1.)  Plaintiff alleged claims under 42 U.S.C. § 1983 against the District and Woerner, claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act against the District, and claims under Texas Education Code § 22.0511 against Woerner.  (Id.)  He sought compensatory damages for physical pain and suffering, mental anguish, past and future medical expenses, loss of future earning capacity, costs of a free appropriate education; punitive damages; and attorney's fees.  (Id.)

        On June 14, 2013, Plaintiff filed an Amended Complaint, naming only the District ("Defendant") and removing Woerner as a defendant.  (Dkt. # 22.)  The Amended Complaint alleged four separate Fourteenth Amendment claims under

11

§ 1983, claims under § 504 of the Rehabilitation Act, and claims under the Americans with Disabilities Act.  (Id.)

On April 4, 2014, Defendant filed the instant Motion for Summary Judgment.  (Dkt. # 31.)  On May 19, 2014, Plaintiff filed his Response (Dkt. # 37) and on May 29, 2014, Defendant filed its Reply (Dkt. # 38).  On the same day, Defendant also filed Objections to Plaintiff's Evidence in Opposition to Defendant's Motion for Summary Judgment.  (Dkt. # 39.)

On January 23, 2015, the Court held a hearing on the motion.  At the hearing, Plaintiff abandoned his Section 1983 claims.  In response to Plaintiff's request, the Court granted Plaintiff the opportunity to provide a supplemental explanatory chart addressing Defendant's Objections to Plaintiff's Evidence in Opposition to the Motion for Summary Judgment.  On February 9, 2015, Plaintiff filed his supplemental response to Defendant's Objections (Dkt. # 50), and on February 27, 2015, Defendant filed its reply (Dkt. # 51).

LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence."  Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

13

<u>DISCUSSION</u>

In his Amended Complaint, Plaintiff brings (1) claims under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for Defendant's failure to identify Plaintiff as a student with a disability, failure to keep him safe from harm, and failure to provide him an environment that was not injurious to his physical well-being; and (2) claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, for Defendant's failure to make reasonable accommodations for Plaintiff and failure to train and/or educate its agents on the needs of students with disabilities.[3]  (Dkt. # 22.)

Defendant argues for summary judgment on the basis that: (1) Plaintiff's claims are time-barred by two Texas statute of limitations provisions; (2) Plaintiff's claims are barred for failure to exhaust administrative remedies as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1450, and Texas Administrative Code § 89.1151; and (3) Plaintiff's Rehabilitation Act and Americans with Disabilities Act claims fail because there is

---

[3] In his Amended Complaint, Plaintiff also alleged claims under 42 U.S.C. § 1983 that Defendant violated his liberty interest in human dignity, bodily integrity, and freedom from State occasioned harm to his human dignity and bodily integrity, and his property interest in his education, in violation of the Fourteenth Amendment. (Dkt. # 22.)  However, Plaintiff waived those claims at the January 23, 2015 hearing, so the Court considers all arguments on the decision moot and does not address them.

no showing that there was intentional discrimination.  (Mot.)  Defendant also objects

to various portions of Plaintiff's evidence.  (Dkt. # 39.)

I.      Defendant's Objections to Plaintiff's Evidence

        Defendant objects to various portions of Plaintiff and Lori's affidavits,

which were submitted as Plaintiff's summary judgment evidence, because the

statements a) are self-serving, b) contain assertions that are not based in personal

knowledge, c) contain hearsay, d) are based on pure speculation, and e) conflict with

Plaintiff's deposition testimony. (Dkt. # 39.)

        Under Federal Rule of Evidence 56(c)(4), a "declaration used to

support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that that the . . . declarant is competent

to testify on the matters stated."[4]  Any statements in a declaration that violate this

rule are not considered for summary judgment purposes; any portions of the

declarations that are not struck remain part of the summary judgment record.  See

Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 607 (5th Cir. 2008)

_____

[4] Although the affidavits of Plaintiff and Lori are unsworn, they are nevertheless
entitled to consideration because they fall within the statutory exception permitting
consideration of unsworn oaths.  28 U.S.C. § 1746 (2012); see also Nissho-Iwai Am.
Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988) ("In general, an unsworn
affidavit is incompetent to raise an issue of fact to preclude summary judgment;
however, 28 U.S.C. § 1746 provides an exception that permits unsworn declarations
to substitute for an affiant's oath if the statement is made 'under penalty of perjury'
and verified as 'true and correct.'")

(citing <u>Akin v. Q–L Invs., Inc.</u>, 959 F.2d 521, 531 (5th Cir. 1992)); <u>Williamson v. U.S. Dep't of Agric.</u>, 815 F.2d 368, 383 (5th Cir. 1987).

        The Court addresses each of Defendant's objections to the Declarations of Plaintiff and Lori in turn.

        A.    <u>Self-Serving</u>

        Defendant first argues that Plaintiff's evidence is insufficient to defeat a motion for summary judgment because he relies "almost entirely" on his declaration and that of his mother.  (Dkt. # 39 ¶ 2.)  The fact that Plaintiff's statements were self-serving, without more, is an insufficient reason to disregard the evidence.  "[M]erely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient.  Much evidence is self-serving and, to an extent, conclusional." <u>Rushing v. Kan. City S. Ry.</u>, 185 F.3d 496, 513 (5th Cir. 1999), <u>superseded by</u> Fed. R. Evid. 103(a) <u>on other grounds as recognized in</u> <u>Mathis v. Exxon Corp.</u>, 302 F.3d 448, 459 n.16 (5th Cir. 2002).  So long as the affidavit is based on personal knowledge and contains sufficient factual assertions, its self-serving nature is irrelevant. <u>See</u> <u>In re Yarn Processing Patent Validity Litig.</u>, 498 F.2d 271, 287 (5th Cir. 1974) (finding that the district court erred in excluded testimony as self-serving because the testimony raised sufficient facts to create a question of fact and credibility issues must be left for the trier of fact).  To the extent that the Declarations of Plaintiff and Lori are based on their personal knowledge, the

16

Declarations can be considered.  Therefore, the Court **DENIES** Defendant's

objection to the Declarations of Plaintiff and Lori as a whole, but examines whether

the challenged statements in each Declaration are based on the declarants' personal

knowledge and are otherwise admissible.

       B.     <u>Personal Knowledge</u>

       Defendant argues that various statements in the Declaration of Plaintiff

and Lori are not based on personal knowledge in violation of Federal Rule of

Evidence 602.[5]  (Dkt. # 39 ¶ 3.)

       The Advisory Committee notes to Rule 602 defines personal

knowledge to mean that the witness "must have had an opportunity to observe, and

must have actually observed the fact."  F. R. Evid. 602 advisory committee's note.

A statement is not within a declarant's personal knowledge if the statement is based

on information and belief.  <u>See</u> <u>de la O v. Housing Auth. of El Paso</u>, 417 F.3d 495,

502 (5th Cir. 2005) (citing <u>Bolen v. Dengel</u>, 340 F.3d 300, 313 (5th Cir. 2003)).

       Defendant first argues that the Plaintiff's statements in paragraphs 4

and 27 that "Mr. Belk did not review Preparticipation Physical Evaluation and

Medical History forms" are beyond Plaintiff's personal knowledge.  (Dkt. # 39 ¶ 3.)

With regard to paragraph 4, Defendant takes this statement out of context; Plaintiff's

---

[5] The Court notes that the personal knowledge requirement arises dually from
Federal Rule of Civil Procedure 56(c)(4) and Federal Rule of Evidence 602, which
is incorporated therein.

affidavit states, "To my knowledge, neither Belk nor anyone with the school reviewed this form with me."  (Blake Aff. ¶ 4.)  Because this statement is based on and limited to Plaintiff's memory of staff interacting personally with him, it is within his personal knowledge.  The Court **DENIES** Defendant's objection as to this paragraph.  With regard to paragraph 27, Defendant is correct.  Plaintiff alleges that his Pre-participation Physical Evaluation and Medical History form for 12th grade "was not reviewed by Belk or anyone else with the school."  (Id. ¶ 27.) Plaintiff argues that this statement is based on personal knowledge because his declaration begins and ends with a note that the declaration is based on his personal knowledge.  (Dkt. # 50 at 3.)   However, Plaintiff does not indicate that he would have had the opportunity to observe any type of review of the form, and therefore the statement is not within his personal knowledge.  Therefore, the Court **GRANTS** Defendant's objection as to that portion of paragraph 27.

Next, Defendant argues that Plaintiff's statement in paragraph 10 that "no one examined or replaced his helmet" is not within Plaintiff's personal knowledge.  (Dkt. # 39 ¶ 3.)  In his declaration, Plaintiff states, "to my knowledge no one from the school ever had the helmet looked at and it was never replaced." (Blake Aff. ¶ 10.)  Whether Plaintiff's own football helmet was replaced is a matter within Plaintiff's personal knowledge; presumably, Plaintiff wore the helmet at every practice and would know whether the helmet remained the same.  However,

18

Plaintiff does not indicate that he would have had the opportunity to observe any type of examination of the helmet, and therefore the statement is not within his personal knowledge.  Therefore, the Court **GRANTS** Defendant's objection as limited to the statement that "no one from the school ever had the helmet looked at."

Next, Defendant argues that Plaintiff's statement in paragraph 35 that "his homework was never graded" is not within Plaintiff's personal knowledge. (Dkt. # 39 ¶ 3.)  In his Declaration, Plaintiff states, "my family and I discovered that [the homework] was never actually graded.  Rather, I was just assigned a grade arbitrarily."  (Blake Aff. ¶ 35.)  Plaintiff asserts no basis for this assertion; rather, it appears to be Plaintiff's mere belief, unsupported by any personal observation. Therefore, the Court **GRANTS** Defendant's objection as to the statement that Plaintiff's homework was never graded.

Next, Defendant argues that Plaintiff's statements in paragraphs 26 and 29 that "his mother told school officials about his condition" is not within Plaintiff's personal knowledge.  (Dkt. # 39 ¶ 3.)  In his Declaration, Plaintiff states, "my mother told both Coach Woerner and Belk that I had been referred to a neurologist because of my serious head injury" and "[m]y parents informed Coach Woerner of my medical limitations and that Dr. Heinze did not believe that I would be ready to play again until midseason."  (Blake Aff. ¶¶ 26, 29.)  These statements may very well be within Plaintiff's personal knowledge, as his parents probably told him that

19

they had these conversations.  However, Defendant also objects to these statements as hearsay, which they are.  Plaintiff's mother can testify as to what she spoke to Coach Woerner about, but Plaintiff's recounting of what she told Coach Woerner is impermissible hearsay.[6]  Therefore, the Court **GRANTS** Defendant's objection as to Plaintiff's statements that his parents told school officials about his condition.

Defendant's next two objections are substantially the same.  Defendant argues that Plaintiff's statement in paragraph 33 that "I understand that Belk had informed my mother I was not going to participate in the scrimmage, but Woerner wanted me to do so anyway" is not within Plaintiff's personal knowledge.  (Dkt. # 39 ¶ 3; Blake Aff. ¶ 33.)  At the very least, this statement is hearsay,[7] and the Court **GRANTS** Defendant's objection as to Plaintiff's statements about his mother's conversation.  Defendant also argues that Plaintiff's statements about conversations between his mother, Mrs. Hartung, and other unspecified staff

---

[6] Plaintiff's arguments that Rule 803(4) provides a hearsay exception are irrelevant. (Dkt. # 50.)  Plaintiff offers the statements for proof that his mother told Woerner and Belk about a condition, not for proof that the condition is true.  Accordingly, there is only one level of hearsay here, which is that Plaintiff is reporting statements made by his mother.  Since his mother has attested to the same events and she was the person making the statements to Woerner and Belk, the exclusion of Plaintiff's statement has no bearing on the evidentiary record in the case.

[7] Plaintiff argues that Rule 804(b)(3) exempts these statements as statements against interest.  A statement against interest must be contrary to the declarant's proprietary, pecuniary, or penal interest.  Fed. R. Evid. 804(b)(3)(A).  There is nothing in this statement that is against Plaintiff's interest.  The Court finds Plaintiff's argument meritless.

members is not within his personal knowledge.  (Dkt. # 39 ¶ 3.)  The relevant

portions of Plaintiff's affidavit state:

> 51.   Ms. Hurting informed my parents that I was failing my forensics class.  My mother immediately called the school for a fuller explanation.  My mother requested a meeting with the counselor, the forensics teacher and the Homebound teacher.
> 52.  My mother was notified on the morning of the meeting before the meeting had even begun that I was passing Forensics.
> 53.  In fact, my family and I were informed by the District that I could not even attend any school functions while on homebound.

(Blake Aff. ¶¶ 51–53.)  With the exception of the last paragraph, these statements, at

the very least, constitute hearsay.  However, because Plaintiff attests in that he was

part of the conversation regarding attendance at school functions, the last paragraph

is within his personal knowledge.  Accordingly, the Court **GRANTS** Defendant's

objection as to paragraphs 51 and 52, but **DENIES** the objection as to paragraph 53.

Additionally, Defendant argues that various statements in Lori's

affidavit are not within her personal knowledge.  (Dkt. 39 ¶ 3.)  Defendant first

objects to her recounting of a conversation between Blake's father and various

District staff members in the Lampasas locker room.  (Id.)  Because her statement

recounts events that only took place between her husband and staff members and

because she gives no indication that she was present, the Court **GRANTS**

Defendant's objection as to paragraph 5 of her affidavit.

Next, Defendant objects to Lori's statement that district staff were unwilling to accompany her family to the hospital.  (Id.)  The full statement in the affidavit reads "We informed the hospital that neither Blake's trainer nor Coach was willing to accompany us to the hospital."  (Lori Aff. ¶ 7.)  Because the statement is about what she informed the hospital, it is within her personal knowledge, and the Court **DENIES** Defendant's objection.

Next, Defendant objects to statements in paragraphs 8, 13, 20, 23, 24, 25, 28, 31, and 38 on the basis that she describes incidents where she was clearly not present.  (Dkt. # 39 ¶ 3.)  Paragraph 8 states:

> On October 26, 2009, the School District completed a Notice of Claim with Hartford Life and Accident Insurance Company for injuries sustained by Blake, noting the body of the form only, "Athlete was hit in the head."  Athletic Trainer Brandon Belk signed the claim.  The claim also required a Parent/Guardian Certification Signature yet none was obtained.  Further, the District never notified Blake or us of the insurance claim.

(Lori Aff. ¶ 8.)  Although the completion of the form is not within Lori's personal knowledge, the failure to obtain a parent/guardian signature and the failure to notify the family of the insurance claim is within her knowledge as Ripple's parent.  Accordingly, the Court **GRANTS** Defendant's objection to paragraph 8 as to the first two sentences, and **DENIES** the objection as to the third and fourth sentences.

Paragraph 13 states:

On December 12, 2009, Blake and two of his friends were in a car accident while on their way to school.  Due to Blake's previous head injury and his being under care of doctors for a concussion, he was transported to Seton Highland Lakes Hospital as a precaution.  At the hospital a cat scan was performed.  The cat scan revealed that there were no changes to the previous concussion, but give nodules were found on Plaintiff's thyroid.  At that time, our family's focus thus shifted to this medical issue.  School officials were also aware of the accident and Blake's medical condition, but never requested any clearance from his doctors after the incident.

(Lori Aff. ¶ 13.)  With the exception of the sentence "At that time, our family's focus thus shifted to this medical issue," the Court agrees that this testimony is beyond Lori's personal knowledge, as there is no indication she was present at the accident or at the hospital.  Accordingly, the Court **GRANTS** Defendant's objection as to paragraph 13, with the exception of the sentence noted above.

The relevant portion of Paragraph 20 states:

During a practice in August of his senior year, Coach Woerner forced Blake to run so hard that Blake started to bleed from his ears and nose.  During that practice, the trainer, Belk, observed him vomit more than once and told him only to stop running briefly but not to take a knee.  After practice, Blake reported to Belk that he had experienced a nosebleed and had bled from his ears.  Belk told Blake to go home and drink lots of fluids and to rest up for practice the next day.  Blake still had a severe headache and had blood on his pillow in the morning.  Knowing that Blake would have to run more if missed practice, Blake choose [sic] to go to school despite how he felt.

(Lori Aff. ¶ 20.)  Plaintiff incorrectly contends that the recitation of facts from evidence demonstrates some sort of personal knowledge.  (Dkt. # 50 at 15.)  The

Court agrees that these statements are not within Lori's personal knowledge and

**GRANTS** Defendant's objection as to the portion of paragraph 20 recited here.

The relevant portion of paragraph 23 states:

> At this time of the school year, the initial four days were "shirts and helmets," then the players transitioned to practice in full pads. Blake vomited multiple times every day and the trainer, Belk, delayed Blake practicing in pads a few days. Coach Woerner approached Blake to remind him that the upcoming Saturday was an inner-squad scrimmage that was to be followed soon after by a scrimmage against another team. He stressed that anyone who could participate in these scrimmages against had to have practiced a certain number of days in pads. He told Blake explicitly that he could not play in the scrimmages unless he got into pads soon.

(Lori Aff ¶ 23.) Again, Plaintiff incorrectly contends that the recitation of facts

from evidence demonstrates some sort of personal knowledge. (Dkt. # 50 at 15.)

The Court agrees that this testimony is outside of Lori's personal knowledge and

**GRANTS** Defendant's objection as to the portion of paragraph 23 recited here.

The relevant portion of paragraph 24 states: "Coach Woerner pressured

Blake to participate in the required number of full pad drills he forced Blake to go

on the field at the team's second scrimmage, where Blake again suffered injuries."

(Lori Aff. ¶ 24.) This testimony is outside of Lori's personal knowledge. The Court

**GRANTS** Defendant's objection as to the portion of paragraph 24 recited here.

Paragraph 25 states:

> The weekend before the Fall 2010 semester (his Senior year) started, we learned that much work remained for Blake to receive his required

24

Algebra 2 credit.  Further, Blake would have to do a large amount of
extra work over the course of two weeks to catch up and be qualified
as a senior.  He first received some help form [sic] two of his
classmates, Kylee Ann Futtrell and Mitchell Clark.  Fortunately,
Blake received help from family.  Since he received no assistance
from the District, it was only through Blake's extra effort and the
intervention of family and friends that he was able to complete the
work.  The work was then delivered to the school, though Blake and I
later discovered that it was never actually graded.  Rather, Blake was
just assigned a grade arbitrarily.  Again, he never received any
assistance from the school.

(Lori Aff. ¶ 25.)  As the Court discussed with regard to the similar statement in

Plaintiff's affidavit, the sentences regarding the homework never being graded is not

within Lori's personal knowledge.  Although the remainder of the paragraph could

be within Lori's knowledge if she was supervising or coordinating Blake's end of

the Homebound Services, she does not attest to that involvement.  Accordingly the

Court **GRANTS** Defendant's objection as to paragraph 25.  The Court also notes

that Plaintiff made a virtually identical statement in his affidavit, so the information

will nevertheless be available to the Court.

Paragraph 28 states,

On March 28, 2011 Blake had surgery to remove his enlarged tonsils.
After his surgery, Blake continued to experience (and complain of)
headaches, nausea, and vertigo.  Blake became exceedingly more ill
and was unable to go back to school.  Blake was so disabled at this
time that he was placed homebound educational services.  Blake
remained in Homebound Services until he was able to graduate.

25

(Lori Aff. ¶ 28.)  This paragraph suffers from the same problem as does paragraph 25.  Again, while the Court **GRANTS** Defendant's objection, it notes that Plaintiff's virtually identical statement is available to the Court.

The relevant portion of paragraph 31 states: "The next and final occasion that Blake received Homebound Services was on or about March 12, 2010, after Blake had a thyroidectomy.  The recovery was also complicated by his existing chronic, severe headaches, nausea and vertigo. . . . His education continued to suffer both academically and non-academically."  (Lori Aff. ¶ 31.)  Again, the Court notes that Plaintiff's virtually identical statement is available to the Court.  The Court **GRANTS** Defendant's objection as to the portions of paragraph 31 recited here.

Finally, paragraph 38 states: "We were informed by the District that he could not even attend any school functions while on homebound.  He missed both his Junior and Senior Proms because he was receiving Homebound Services.  He also missed project graduation because he was ill."  (Lori Aff. ¶ 38.)  There is sufficient evidence of personal knowledge here; she states that she was informed that he could not attend and, as Plaintiff's mother, she would know if he attended.  Accordingly, the Court **DENIES** Defendant's objection as to all but the first sentence of paragraph 38.

C.    Hearsay

Defendant argues that various "statements concerning what health care providers allegedly told Plaintiff and Lori or diagnoses" constitute hearsay and are therefore inadmissible.  (Dkt. # 39 ¶ 4.)  Hearsay is "a statement that[] . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

Although Plaintiff's description of his medical symptoms is within his personal knowledge and is not hearsay, Plaintiff's own recounting of his medical diagnoses and his doctor's orders, offered for proof of those diagnoses and orders, constitutes inadmissible hearsay.  See, e.g., Scott v. Turner Indus. Grp., LLC, No. 09-872, 2011 WL 5023842, at *3 (M.D. La. Oct. 19, 2011) ("While plaintiff may testify as to the symptoms that led her to seek treatment and to the treatment she undertook, any clinical diagnoses must be attested to by Dr. Todd"); Hood v. City of Cleveland, No. 4:10-CV-00009-SA-DAS, 2011 WL 533676, at *5 (N.D. Miss. Feb. 15, 2011) (finding that Plaintiff's "statements regarding her doctor 'not approving her to return to work' [were] hearsay and incompetent summary judgment evidence"); Ham v. Lopez, No. 5:01-ca-936-NN, 2002 WL 31396066, at *5 (W.D. Tex. Sept. 26, 2002) (finding that Plaintiff's statements "that he suffered an infection and was permanently disabled due to lack of physical therapy or proper

27

stump care," if based on a diagnosis, were impermissible hearsay).  Similarly, Lori's statements about Plaintiff's medical conditions, offered for proof of those conditions, are inadmissible hearsay.  See, e.g., Weesner v. Mills, No. 3:00-CV-2738-BF, 2004 WL 2100655, at *1 (N.D. Tex. Sept. 20, 2004) (holding that the statements of the declarant, Plaintiff's mother, about "what the doctor allegedly told her, offered for the truth of the doctor's opinions" was hearsay that did not come within any exception).

Plaintiff cites to Federal Rule of Evidence 804(3) in support of the admission of many of these statements.  (See Dkt. # 50.)  Rule 803(4) permits hearsay testimony when the statement is made for and is reasonably pertinent to medical diagnosis or treatment, or when it describes medical history, past or present symptoms or sensations, their inception, or their general cause.  Fed. R. Evid. 803(4).  The Rule is designed to permit physicians, hospital attendants, ambulance drivers, certain medical professionals, and sometimes family members to testify as to the medical conditions described to them by the patient.  Fed. R. Evid. 803(4) n.4.  The rationale behind the rule is that a patient has a strong motivation to be truthful in making statements for diagnosis or treatment purposes; accordingly, a recounting of that statement can serve as proof of the statement.  Id.; Rock v. Huffco Gas & Oil Co., Inc., 922 F.2d 272, 277 (5th Cir. 1991).

Neither the rule nor its rationale apply when a patient is recounting the medical diagnoses or orders from his physician.  In such circumstances, there is no more motivation for the patient to be truthful than there is in any other common hearsay scenario.  Accordingly, Plaintiff's reliance on Rule 804(3) for admission of the medical-related hearsay statements is misplaced.

In sum, although Plaintiff's statements about his physical symptoms are admissible, all of the statements in the Declarations of Plaintiff and Lori regarding Plaintiff's medical diagnoses are inadmissible hearsay.  The Court therefore **GRANTS** Defendant's objections with regard to the following statements by Plaintiff: "I had what I now understand to be a concussion about two weeks before the Lampasas game" (Blake Aff. ¶ 11); "I had what is termed a 'shearing' where the back of the neck sheared the nerves in my brain" (id. ¶ 12); "At the hospital, I was given a cat [sic] scan which confirmed that I suffered a concussion" (id. ¶16); "five nodules were found on my thyroid" (id. ¶ 21); "Doctors at the Mayo Clinic reported that I had an autonomic dysfunction brought on by the head injuries I had experienced playing football." (id. ¶ 25); "After describing my symptoms, my doctor urgently directed my mother to get me to the Emergency Room immediately. . . . We were told that I was severely hydrated.  I required at least two bags of fluid and first Fentanyl, then Demeroll, and finally, Morphine to get my pain under control" (id. ¶ 32); "Dr. Temple told my family that I had suffered between 30 and

29

40 concussions or sub-concussions" (id. ¶ 44); "After conducting a similar review of

scans and medical record [sic] and conducting his own interview and examination,

[Dr. Bertelson] confirmed what Dr. Temple told my family (id. ¶ 45); and "after I

had a thyroidectomy" (id. ¶ 46).

The Court also **GRANTS** Defendant's objections with regard to the

following statements by Lori: "The cat scan revealed that there were no changes to

the previous concussion, but five nodules were found on Plaintiff's thyroid" (id.

¶ 13); "Doctors at the Mayo Clinic reported that Blake may have an autonomic

dysfunctions [sic] brought on by the head injuries Blake experienced playing

football" (id. ¶ 17); "After the doctor heard me describe Blake's symptoms urgently

directed me to get Blake to the Emergency Room immediately.  We were told that

Blake was severely dehydrated.  He required at least two bags of fluid and first

Fentanol, then Demerol, and finally, Morphine to get his pain under control" (id.

¶ 20); "Blake also suffered a compartment syndrome injury as a result of direct

strikes to his calf.  This results in a blood clot on the muscle which requires

immediate treatment because of the risk of losing the limb.  This often means

surgery but definitely required rest and no direct hits to the leg" (id. ¶ 26); "After his

surgery, Blake continued to experience (and complain of) headaches, nausea, and

vertigo" (id. ¶ 28); "After reviewing Blake's scans and medical record [sic] and

doing in depth interviews with and examination of Blake, he told us that Blake had

30

suffered between 30 and 40 concussions (id. ¶ 29); "After conducting a similar review of scans and medical record [sic] and conducting his own interview and examination, [Dr. Berteleson] confirmed what Dr. Temple told us" (id. ¶ 30); and "after Blake had a thyroidectomy.  The recovery was also complicated by his existing chronic, severe headaches, nausea and vertigo" (id. ¶ 31).

The Court **DENIES** Defendant's objections with regard to the following statements, because they are mere descriptions of Plaintiff's physical symptoms or nonhearsay: "symptoms related to his [sic] head injuries (chronic, severe headaches, nausea and vertigo) continued to impact my participation and attendance" (Blake Aff. ¶ 20); "I was told that I could eventually play football again, but that it would take some time before I could get back out on the field. My doctors told me that it would take time and that I would have to '. . . . take baby steps and not push it'" (Blake Aff. ¶ 25); "My recovery was complicated by my existing chronic, severe headaches, nausea and vertigo" (Id. ¶ 46); "Blake was given a cat [sic] scan which confirmed that Blake had suffered a concussion" (Lori Aff. ¶ 7); "Dr. Buxton gave me information print-outs related to Blake's post-concussive syndrome diagnosis, symptoms and his own recommendations" (Lori Aff. ¶ 11); "At the hospital a cat [sic] scan was performed" (id. ¶ 13); "A letter from [Blake's] doctor to the school stated generally that he was to take it very slow and specifically stated that he was not to participate in the first scrimmage of the year in 2010" (id.

31

¶19); "Dr. Heinz did not believe that [Blake] would be ready to play again until midseason.  They recommended he start out with very light conditioning, not even running" (id. ¶ 21); and "Blake had surgery to remove his enlarged tonsils" (id. ¶ 28).

        D.    <u>Speculation</u>

Defendant argues that statements in the Declarations of Plaintiff and Lori are based on pure speculation.  (Dkt. # 39 ¶ 5.)  The Court is "not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence."  <u>Chaney v. Dreyfus Serv. Corp.</u>, 595 F.3d 219, 229 (5th Cir. 2010).

Specifically, Defendant challenges Plaintiff's statements in paragraphs 4 and 6 that officials did not review his Preparticipation Physical Evaluation and Medical History forms.  (Dkt. # 39 ¶ 5.)  For the same reasons that the Court denied the Defendant's objection to the same statements on personal knowledge grounds, the Court **DENIES** Defendant's objection as to paragraphs 4 and 6.

Next, Defendant challenges Plaintiff's statement that he was transported to the emergency room due to his previous head injury.  (<u>Id.</u>)  The Court agrees that Plaintiff presents no basis to find the conclusion substantiated by evidence, and **GRANTS** Defendant's objection as to paragraph 21.

Next, Defendant challenges Plaintiff's statement, "I knew if I did not continue playing, that there would retaliation against me at school and in the community."  (Id.; Blake Aff. ¶ 39.)  This allegation is wholly conclusory; Plaintiff provides no reason for his "knowledge" that his decision not to play would result in retaliation.  Accordingly, the Court **GRANTS** Defendant's objection as to paragraph 39.

Next, Defendant challenges Lori's statement that "the District never notified Blake or us of the insurance claim" as speculative.  (Dkt. # 39 ¶ 5; Lori Aff. ¶ 8.)  The Court disagrees.  Lori is entitled to testify to whether the District notified her of something.  Accordingly, the Court **DENIES** Defendant's objection as to paragraph 8.

Next, Defendant objects to paragraph 33 on the basis that the contention that "Plaintiff did not receive an education to the same extent as Plaintiff's non-disabled peers" is unduly speculative.  (Dkt. # 39 ¶ 5.)  Defendant's objection takes the statement out of context.  The paragraph reads: "Blake never received any accommodations or modifications to the educational plan so that he could benefit from the educational curricula to the same extent as non-disabled students."  (Lori Aff. ¶ 33.)  The Court finds this statement admissible, and **DENIES** Defendant's objection as to paragraph 33.

Defendant also objects to paragraph 37, where Lori states, "Had Blake been in class, received accommodations, or the Homebound Services promised him during this time, he would have received a better education."  (Dkt. # 39 ¶ 5; Lori Aff. ¶ 37.)  The Court agrees that the statement is speculative and based on a conclusory allegation, and **GRANTS** Defendant's objection as to paragraph 37.

Finally, Defendant challenges language in paragraphs 7 and 25 of Lori's affidavit, which the Court has already stricken on personal knowledge grounds.  The Court considers these objections **MOOT.**

E.    Conflicting Testimony

Defendant also argues that statements in the Declarations of Plaintiff and Lori are in conflict with Plaintiff's deposition testimony.  (Id. ¶ 6.)  Defendant argues that, in so doing, "Plaintiff[] attempts to create a fact issue by contradicting his own prior testimony."

"It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."  S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996) (citing Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 137 n.23 (5th Cir. 1992)). This circuit recognizes the "sham-affidavit rule," which prohibits a non-moving party from "manufactur[ing] a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation."

34

Guerrero v. Total Renal Care, Inc., 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013).

The "sham-affidavit rule 'is applied sparingly' and may be invoked only where there

is 'some inherent inconsistency between an affidavit and a deposition.'"  Axxiom

Mfg., Inc. v. McCoy Invs., Inc., 846 F. Supp. 2d 732, 749–50 (S.D. Tex. 2012).

Specifically, Defendant objects to statements in Plaintiff's Declaration,

paragraphs 2, 11, 30, 32, and 57, and statements in Lori's Declaration, paragraph 20.

The Court will address each in turn:

In paragraph 2 of his declaration, Plaintiff states, "I never received

training or information regarding injuries."  (Blake Aff. ¶ 2.)  Defendant asserts that

this directly conflicts with Plaintiff's statement that "Coach Woerner each year

talked to [the players] about 'helmet concussion rules, heat exhaustion, and other

things.'"  (Dkt. # 39 ¶ 6.)  This statement is clearer in the context of the full

conversation:

> Q: Who are the coaches you remember talking to you about the signs of heat
> exhaustion?
> A: At the beginning of the year Coach Woerner would all get us around in a
> group and he'd go over the helmet concussion rules, heat exhaustion and
> other things.
> Q: What did Coach Woerner tell you to do if you experienced any of the
> symptoms of heat exhaustion?
> A: To alert a coach.
> Q: Did Coach Woerner tell you also talk to you about making sure you took
> your water breaks and stayed hydrated?
> A: Yes, ma'am.
> Q: What did Coach Woerner tell you about the helmet concussion rules?

A: He read off the sticker on the helmet that said the helmet will not prevent a
concussion from happening.
Q: What else did he tell you?
A: That was it. That's all I remember. . . .
Q: During the meeting at which you said he went over helmet concussion
rules and heat exhaustion, what else did he discuss?
A: That's it, just the heat exhaustion and the concussion sticker on the back of
the helmet.
Q: Do you remember Coach Woerner ever saying anything about make sure
you talk to a trainer if you feel like you have an injury?
A: No, ma'am, I don't remember.
Q: Do you remember any talking to you about speaking with the trainer if you
felt like you had any type of injury?
A: No ma'am, I don't remember.

(Blake Dep. 44: 19–25, 45: 1–11, 46: 4–16.)  While Plaintiff's Declaration indicates

he received minimal instruction regarding heat exhaustion and helmets, it does not

indicate he received instruction on injuries. The Court **DENIES** Defendant's

objection on this issue; the cited testimony does not directly conflict with Plaintiff's

Declaration.

Next, Defendant objects to paragraph 11 of Plaintiff's Declaration,

where Plaintiff states, "No one directed me for any further treatment . . . ."  (Dkt.

# 39 ¶ 6.)  Defendant argues that this statement conflicts with Plaintiff's testimony

that he informed Athletic Trainer Brandon Belk ("Belk") about his headaches, and

Belk asked him if he needed to stop and see a doctor.  (Id.)  Defendant again takes

Plaintiff's statement out of context.  Paragraph 11 of Plaintiff's Declaration refers

specifically to his Fall 2009 concussion prior to the Lampasas game.  (Blake Aff.

36

¶ 11.)  Plaintiff discusses that incident in his testimony in terms entirely consistent with paragraph 11 of the Deposition.  (Blake Dep. 63: 22–25, 64: 1–21 ("I told [Mr. Belk] that my head hurt. . . . He said that I should lay down and see if that won't help and gave me medication, and then just said lay down and rest on the trip home.").)  The Court **DENIES** Defendant's objection on this issue; the two cited passages do not directly conflict with each other.

Next, Defendant objects to paragraph 32 of Plaintiff's Declaration and paragraph 20 of Lori's Declaration, during which both state that "coaches made Plaintiff run until his ears and nose bled and that he told Athletic Trainer Belk." (Dkt. # 39 ¶ 6.)  Defendant argues that Plaintiff's testimony at deposition provided an entirely different account of the matter, "stating that the players self-initiated running sets after practice and that he did not tell any coach or trainer about the bleeding."  (Id.)

Plaintiff's testimony indicates that the players "ran three extra sets, three 40-yard dashes after what we were running by the coaches.  The coaches were running us earlier harder and harder and harder because we just were messing up on getting off the line or were doing something and weren't doing it right, so we just kept running more and more.  And then after, Austin and David [two players] said that we should run three more perfect ones to get it right and show that we were a team. . . . [The coaches] were all standing outside on the field watching us."  (Blake

37

Dep. 40: 17–25, 41: 9–10.)  The bleeding at issue followed the entire practice, which players were required to participate in by the coaches, not just the three additional sets in isolation.  (See Blake Aff. ¶ 32; Blake Dep. 38: 20:25.)  Therefore, the paragraph 32 of Plaintiff's Declaration does not have inherent inconsistency with Plaintiff's testimony with regard to the description of the practice.

Plaintiff's testimony does indicate that he does not remember telling anyone other than his mother about the bleeding.  (Blake Dep. 42: 3–17.)  That statement directly conflicts with Plaintiff's statement in his Declaration that he "reported to Belk that [he] had an experienced [sic] a nosebleed and had bled from my ears. He told me to go home and drink lots of fluids and to rest up for practice the next day, but did not provide any to me [sic] at that time."  (Blake Aff. ¶ 32.)  Therefore, the Court **DENIES** Defendant's objection with regard to the characterization of the practice, but **GRANTS** with regard to the statements regarding Belk.

Next, Defendant objects to the statements in paragraph 57 of Plaintiff's Declaration and 42 of Lori's Declaration, which state that "Plaintiff had been a member of the school's National Honor Society."  (Dkt. # 39 ¶ 6.)  Defendant argues that Plaintiff testified that he did not belong to that organization.  (Id.)  Defendant is correct that Plaintiff identified his membership in the National Honor Society as an error in the Amended Complaint.  (Blake Dep. 174: 8–12 ("One

instance [the Amended Complaint] says that I was a National Honor Society

student. I believe there was a miscommunication. I was never one. I was offered, I

was given papers to sign up for it.").)  As Plaintiff's testimony clarifies, he was

offered the opportunity to sign up for National Honor Society, but did not sign up.

(Id. at 174: 10–13.)  Therefore, the Court **GRANTS** Defendant's objection to

paragraph 57 of Plaintiff's Declaration and 42 of Lori's Declaration.

   Defendant's remaining objections do not argue inconsistencies between

Plaintiff's Declaration and testimony.  (Dkt. # 39 ¶ 6.)  Therefore, the Court does

not comment on the objections and will instead address those issues as they arise in

the summary judgment analysis.  See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.,

140 F.3d 622, 625 (5th Cir. 1998) ("Factual controversies are construed in the light

most favorable to the nonmovant, but only if both parties have introduced evidence

showing that a controversy exists.").

II. Whether Plaintiff's Claims Are Barred by Statute of Limitations

   Because the ADA and the Rehabilitation Act do not specify a limitations

period, the Court must determine the applicable limitations periods for the claims at

issue.  See Holmes v. Tex. A&M Univ., 145 F.3d 681, 684 (5th Cir. 1998) ("Neither

Title II of the ADA nor the Rehabilitation Act specify a statute of limitations.").

   "The Rehabilitation Act's coverage is nearly identical to Title II of the

ADA, except that it applies only to entities receiving federal funding."  Id. at

683–84.  Therefore, the Court considers the applicable statute of limitations for these claims together.  See Hainze v. Richards, 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting either section [under Title II or the Rehabilitation Act] is applicable to both.").

To support the possibility that a one-year statute of limitations period may be applicable to these claims, Defendant cites Marc V. v. North East Independent School District, 455 F. Supp. 2d 577, 591–92 (W.D. Tex. 2006), aff'd, 242 F. App'x 271 (5th Cir. 2007).  In Marc V., the plaintiff requested administrative relief through the IDEA's administrative process, discussed in more detail in Section III, as a remedy to his injuries.  Id. at 591.  Texas law creates a one-year statute of limitations period for filing requests for due process hearings under the IDEA.  Id.; see also 19 Tex. Admin. Code § 89.1151(c).  Because the plaintiff filed his request for a hearing two years after receiving notice of the IDEA's procedural protections, the court affirmed the IDEA hearing officer's decision that any events that occurred outside of the one-year statute of limitations could not be considered at the IDEA hearing, as they were time-barred.  Marc V., 455 F. Supp. 2d at 592.

Unlike the plaintiff in Mark V., Plaintiff did not undergo the IDEA administrative process.  While this raises other issues as to whether his claims are administratively barred, it does not raise a statute of limitations issue outside of the IDEA hearing.

40

Because the one-year limitations period is inapplicable, the only applicable limitations period proposed by either party is Texas's two-year statute of limitations period.  (See Mot. at 3 ("Plaintiff's asserted causes of action are subject to either a one-year or a two-year limitations period."); Dkt. # 37 ¶ 11 ("the statute of limitations for a claim based upon these statutes is controlled by the tolling provisions of Section 16.003).)  The Court therefore applies Texas's two-year personal injury limitations period to Plaintiff's ADA and Rehabilitation Act claims. See Frame v. City of Arlington, 657 F.3d 215, 237 (5th Cir. 2011) (en banc) (holding that, because no party disputed the two-year Texas personal injury limitations period as applied to ADA claims, and because of previous case law finding the two-year limitations period applicable in another context, the two-year limitations period was appropriate).

Section 16.003's two-year limitation period is tolled "[i]f a person entitled to bring a personal action is under a legal disability when the cause of action accrues."  Tex. Civ. Prac. & Rem. Code Ann. § 16.001(b).  A person younger than eighteen years old is under a legal disability, and therefore the cause of action does not accrue until the person reaches the age of majority.  Id. § 16.001(a)(1); see also Weiner v. Wasson, 900 S.W.2d 316, 321 (Tex. 1995) (holding that Sections 16.001

41

and 16.003 together "require a minor to file a claim before reaching age twenty for personal injuries sustained during the period of minority").[8]

Plaintiff's ADA and Rehabilitation Act claims arise from two alleged sources: (1) the physical impairments resulting from his concussions, and (2) failure to provide educational accommodation. (Dkt. # 22.) Plaintiff became aware of the physical impairments resulting from his concussions on October 23, 2009, the date that Plaintiff was allegedly diagnosed with a concussion sustained at a football game. (Dkt. # 22 ¶¶ 36–37.) Plaintiff became aware of the school's failure to provide educational accommodation on October 26, 2009, when the school allegedly failed to provide Plaintiff's mother with the school work that he missed during his injury-related absence. (Id. ¶ 43.)

According to the Complaint, Plaintiff's eighteenth birthday occurred on September 10, 2010. (Id. ¶ 61.) Therefore, any injuries Plaintiff sustained before that date occurred when he was a minor—and legally disabled. Although his cause of action would have otherwise accrued in October 2009, his claims for harms

---

[8] At the hearing, defense counsel argued that "the statute of limitations for a 2009 incident may be tolled until 2010, but [it] immediately start[ed] running in 2010 when [Plaintiff] turned 18 years of age." Accordingly, defense counsel argued that Plaintiff had to file suit by 2011 to avoid the time bar because "[i]t's the accrual of the cause [that matters]. . . . [T]hey can't wait an extra year because it always begins upon accrual of the cause of action, not upon the age of majority."
    The Court is unable to find any case law supporting this interpretation of §16.001, and notes that such a reading directly contradicts the interpretation set out by Texas Supreme Court in Weiner.

42

sustained before his eighteenth birthday did not accrue until he reached the age of

majority on September 10, 2010.  <u>See</u> Tex. Civ. Prac. & Rem. Code § 16.001(a)(1).

Plaintiff initiated the present action on September 7, 2012, three days short of the

expiration of the two-year statute of limitations.  (Dkt. # 1.)  Because Plaintiff's

claims come within the applicable two-year limitations period, and are not

time-barred, Defendant is not entitled to summary judgment on the ADA or

Rehabilitation Act claims on that basis.

III.     <u>Whether Plaintiff's Claims Are Barred Under IDEA's Exhaustion
         Requirement</u>

         Defendant next argues that it is entitled to summary judgment on some of

Plaintiff's claims because they were not properly exhausted through the IDEA.

(Mot. at 3.)  Specifically, Defendant raises the following claims as barred by

improper exhaustion: violations of "Child Find" duties, discrimination based on

disability, failure to accommodate disability, and failure to modify services and

environment.  (Mot. at 5.)

         The IDEA explicitly provides that it does not intend to limit the rights and

remedies available under the ADA or the Rehabilitation Act, "except that before

filing of a civil action under such laws seeking relief that is also available . . . the

procedures under subsections (f) and (g) shall be exhausted to the same extent as

43

would be required had the action been brought" under the IDEA.[9]  20 U.S.C.

§ 1415(l) (2012).  A plaintiff cannot avoid the exhaustion requirements of the IDEA

by "repackaging" the "claims under some other statute."  Marc V., 455 F. Supp. 2d

at 592.  However, "'parents may by-pass the administrative process where

exhaustion would be futile or inadequate.'"  Gardner v. Sch. Bd. Caddo Parish, 958

F.2d 108, 112 (5th Cir. 1992) (quoting Honig v. Doe, 484 U.S. 305, 327 (1988)).

      While there is no clear guidance as to all types of relief which are

available both through IDEA and through the Constitution, ADA, or the

Rehabilitation Act, the language of the IDEA and case law define some boundaries.

      The "IDEA requires states and local education agencies receiving federal

IDEA funds to make a FAPE available to children with certain disabilities between

the ages of 3 and 21."  Estate of Lance v. Lewisville Indep. Sch. Dist., 743 F.3d 982,

989–91 (5th Cir. 2014) (quoting Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 290–

91 (5th Cir. 2005) (en banc)) (internal quotation marks omitted).  To achieve that

goal, Congress created a procedure under the IDEA—an impartial due process

hearing before a state hearing officer—to address violations of IDEA provisions.  20

U.S.C. §§ 1400(d)(1)(A), 1415(f).

_____

[9] Exhaustion under subsection (f) requires that the parents involved in an
IDEA-related complaint participate in an impartial due process hearing; exhaustion
under subsection (g) requires the aggrieved party to appeal the decision to the State
educational agency.  20 U.S.C. § 1415(f), (g).

The IDEA contains a FAPE provision, which states that "[a] free public appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412.  The IDEA also contains a "Child Find" provision, which states that "[a]ll children with disabilities residing in [a] State . . . who are in need of special education and related services, are to be identified, located, and evaluated." Id. § 1412(a).  Additionally, it contains a provision requiring schools to create an individualized education program ("IEP") for a qualifying disabled student, which specifies the services and accommodations that the school will provide.  Id. § 1414(d).  The IDEA clearly intends to provide relief for violations of these provisions through the due process hearing.  Id. § 1415(b)(6)(A) (permitting any party to present a complain "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.").

However, "[t]he IDEA should not be construed so broadly that any injury a disabled student suffers in school is automatically subject to the IDEA." Pagan-Negron v. Seguin Indep. Sch. Dist., 974 F. Supp. 2d 1020, 1028 (W.D. Tex. 2013).  Therefore, when a plaintiff "does not allege deprivation of certain educational services," "does [not] seek remedies that are educational in nature," or alleges a "pure discrimination claim" or "non-education injuries" that cannot "be redressed by the IDEA's administrative procedures and remedies," the IDEA

45

exhaustion requirement does not apply.  See id.; Watkins v. Hawley, No. 4:12-CV-

54-KS-MTP, 2013 WL 5204728, at *4 (S.D. Miss. Sept. 16, 2013); Spann ex rel.

Hopkins v. Word of Faith Christian Ctr. Church, 589 F. Supp. 2d 759, 769 (S.D.

Miss. 2008).

> A.   Child Find Duties Under § 504

Plaintiff alleges that Defendant "failed to identify him as a student with a

disability, . . . thereby violat[ing] [its] child-find duties" in violation of § 504 of the

Rehabilitation Act.  (Dkt. # 22 ¶ 124.)  This allegation clearly seeks relief that is

available under the IDEA's Child Find provision, and is therefore subject to the

IDEA's exhaustion requirement, unless it falls within the futility exception.

> B.   Failure to Make Reasonable Accommodations and Modify Programs
>       and Services Under ADA

Plaintiff also alleges that Defendant "fail[ed] to make reasonable

accommodations and modifications to is programs" in violation of Title II of the

ADA.[10]  (Dkt. # 22 ¶¶ 132, 118; see also id. ¶¶ 135–36.)  Because Plaintiff does not

---

[10] Plaintiff's Amended Complaint states that Defendant violated Plaintiff's right to
be free from discrimination under the ADA "by failing to make reasonable
accommodations and modifications to its programs, and by failing to train and/or
education its agents, employees and servants on the needs of students with
disabilities such as Plaintiff.  Moreover, the aforesaid Defendants failed to
implement policies practices and procedures to accommodate the needs of students
with disabilities such as Plaintiff."  (Dkt. # 22 ¶¶ 132, 133.)
       "A plain reading of the ADA evidences that Congress intended to
impose an affirmative duty on public entities to create policies or procedures to

specifically identify the particular facts that form the basis of this claim (rather, Plaintiff incorporates by reference all factual allegations in the Amended Complaint), the Court assumes that Plaintiff refers to his allegations that he never received any accommodations or modifications to the educational plan during his time receiving Homebound Services and that he did not receive accommodations during TAKS or ACT testing. (Id. ¶ 77–82.)  Such accommodations and modifications are exactly the type that would be addressed in an IEP.[11]   Therefore,

---

prevent discrimination based on disability."  Delano-Pyle v. Victoria Cnty., Tex., 302 F.3d 567, 575 (5th Cir. 2002).  Nevertheless, to prove discrimination under the ADA, a plaintiff must show that 1) he is a qualified individual, 2) the defendant excluded the plaintiff from participation in, denied the plaintiff benefits of service, programs, or activities, or otherwise discriminated against the plaintiff, and 3) the exclusion, denial of benefits, or discrimination was because of the plaintiff's disability.  Lightbourn v. Cnty. of El Paso, Tex., 118 F.3d 421, 428 (5th Cir. 1997); see also 42 U.S.C. § 12132.  The only disability discrimination claims that Plaintiff have alleged stem from a failure to accommodate, which were subject to the IDEA's exhaustion requirement.  Accordingly, the additional language in Plaintiff's complaint does not give rise to a separate cause of action under the ADA.

[11] Plaintiff's Response to the Motion for Summary Judgment also suggests that his reasonable accommodation claims stem from Defendant's failure to remove or alleviate the conditions of severe head injury by, for example, failing to give him a correctly fitted helmet, extra padding to protect the head, or a mouth-guard or chin guard to meet Plaintiff's needs, and failure to assure he was sufficiently hydrated. (Dkt. # 37 ¶ 65.)  To the extent that those claims are properly brought as reasonable accommodation claims, they are nevertheless subject to the IDEA's exhaustion requirement and are barred as properly exhausted.  See 20 U.S.C. § 1414(1)(A)(i)(IV) (defining IEP to include ability to "participate in extracurricular and other nonacademic activities").

these allegations seek relief that is available under the IDEA, and is subject to the IDEA's exhaustion requirement, unless it falls within the futility exception.

C.    Additional Rehabilitation Act Claim

Plaintiff also alleges that Defendant's failure to keep him safe from harm and provide him an environment that was not injurious to his physical well-being violated § 504 of the Rehabilitation Act (id. ¶ 125).  The allegations under § 504 of the Rehabilitation Act are not the type of claims that IDEA is meant to cover.  Those allegations relate to Plaintiff's physical safety at school, not whether his education is meeting minimal requirements.  See Morris v. Dearborne, 181 F.3d 657, 674 (5th Cir. 1999).  Accordingly, the claim that Defendant failed to keep Plaintiff safe from harm and provide him an environment that was not injurious to his physical well-being violated § 504 of the Rehabilitation Act is not barred by the IDEA exhaustion requirement.

D.    Futility

1.    High School Graduation

Plaintiff first argues that exhaustion in his case would be futile because he has graduated from high school and is over twenty-one years old, there is no remedy that an IDEA hearing officer could craft to provide him relief.  (Dkt. # 37 ¶ 15–16.)

The Fifth Circuit has not commented on the effect of graduation from exhaustion.  Plaintiff cites to a 2000 case from the Seventh Circuit, which held that

review of Plaintiff's IDEA hearing appeal was moot because the plaintiff graduated

from high school and no action from the court would affect the plaintiff or the

school's rights.  Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v.

Nathan R., 199 F.3d 377, 380–381 (7th Cir. 2000).  However, this holding is limited

to the district court's ability to review an IDEA hearing appeal after a student's

graduation, and the case is inapplicable to the question of whether graduation from

high school renders exhaustion under the IDEA futile.

In fact, the Seventh Circuit is among the majority of circuits that have

addressed the question and found that plaintiffs cannot sidestep the exhaustion

requirements by seeking non-IDEA relief after the plaintiff has graduated, where

IDEA relief could have remedied the injury while the plaintiff was in school.  See

McCormick v. Waukegan Sch. Dist. No. 60, 374 F.3d 564, 568 n.2 (7th Cir. 2004)

("[G]raduation from high school does not necessarily eliminate the possibility of

receiving benefits under IDEA.  Furthermore, the need to exhaust should not depend

upon the extent of delay in litigation or the choice of a plaintiff to delay litigation

until he or she graduates."  (internal citations omitted)).

In Frazier v. Fairhaven Sch. Comm., 276 F.3d 52 (1st Cir. 2002), the First

Circuit found unpersuasive the plaintiff's argument that the IDEA's administrative

process could not provide her remedy because she had graduated.  Id. at 63.

49

> [T]he entire matter of timing is largely within a plaintiff's control. The IDEA provides a comprehensive remedial scheme, and the plaintiffs could have invoked it at any of several different points during [the plaintiff's] high school years.  It would be a hollow gesture to say that exhaustion is required—and then to say that plaintiffs, by holding back until the affected child graduates, can evade the requirement. As the district court aptly observed, permitting a plaintiff to proceed with an IDEA-based claim for money damages under another federal statute without first exhausting administrative remedies 'might simply encourage plaintiffs to wait to dispute the adequacy of their educational programs until after graduation precisely in the hope of recovering money damages. This would mean that plaintiffs would not actually address educational issues when they occur—a situation directly at odds with the IDEA's primary goal of ensuring the education of children with disabilities.'

Id. (quoting Frazier v. Fairhaven Sch. Comm., 122 F. Supp. 2d 104, 111 (D. Mass. 2000)).

Similarly, in Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478 (2d Cir. 2002), the Second Circuit rejected the plaintiff's argument that the IDEA's futility exception was applicable in her case because the process would no longer afford her relief.  Id. at 490.  In that case, the plaintiff brought suit in her final year of high school to remedy education deficiencies that she experienced for a period of ten years.  Id. 480–81. The court emphasized:

> [W]e reiterate our holding that disabled-student plaintiffs, like Polera, should not be permitted to "sit on" live claims and spurn the administrative process that could provide the educational services they seek, then later sue for damages. Were we to condone such conduct, we would frustrate the IDEA's carefully crafted process for the prompt resolution of grievances through interaction between parents of disabled children and the

50

agencies responsible for educating those children. The fact that
the administrative process could not provide damages does not
render Polera's claim futile; she could have obtained complete
relief at the time, through changes to her IEPs, additional
educational services, and, if necessary, remedial education.

Id. at 490.[12]

The only circuit to hold otherwise is the Sixth Circuit.  In Covington v.

Knox Cnty. Sch. Sys., 205 F.3d 912 (6th Cir. 2000), the plaintiff alleged that his

school locked him in a dark, "vault-like" time-out room with no furniture, heat, or

ventilation for hours at a time.  Id. at 913.  The plaintiff's family requested a due

process hearing through the IDEA to address the allegations, but the hearing was

repeatedly delayed over the next three years beyond the plaintiff's graduation from

the school.  Id.  Ultimately, the plaintiff filed suit in district court, alleging various

constitutional claims brought through § 1983. Id.

In that case, the plaintiff argued that, because he already graduated

from the district and no injunctive or equitable relief could have remedied his

injuries, relief under the IDEA was futile.  Id. at 917.  The court found that in the

_____

[12] The Ninth Circuit addressed the question briefly in an unpublished 2008 opinion,
where it rejected the plaintiff's argument that his high school graduation rendered
the IDEA process futile.  Fraser v. Tamalpais Union Sch. Dist., 281 F. App'x 746,
748 (9th Cir. 2008).  "Section 1415(l) makes pursuit of the IDEA remedies a
prerequisite to filing relief under related statutes; failure to use the IDEA remedies
when given an opportunity to do so does not excuse the [plaintiff] from that
requirement."  Id.

plaintiff's "unique circumstances," the IDEA administrative process would have been futile because "the injured child has already graduated from the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole." Id.

The Court finds Covington distinguishable from the case at issue. In Covington, the plaintiff did not repackage his claims to get around the IDEA's exhaustion process; he underwent the IDEA administrative process, but instead resorted to federal court when the IDEA process failed to afford him relief. Here, Plaintiff ignored the IDEA process entirely, even though that process could have afforded the relief he sought as a student. Moreover, the injuries sustained by Plaintiff could have been remedied by the IDEA process, unlike the injuries in Covington, where "damages would have been the only adequate remedy even had he sought immediate relief at the time of the wrongdoing" because "[n]othing could 'undo' the harm that he had suffered." Polera, 288 F.3d at 490; see also Oliver v. Dall. Indep. Sch. Dist., No. 3:01-CV-2627, 2004 WL 1800878, at *6 n.5 (N.D. Tex. Aug. 11, 2004) (distinguishing Covington on the same basis).

Therefore, the Court finds, like the majority of courts addressing this question, that Plaintiff's choice not to avail himself of the IDEA process while a student in the District does not trigger the IDEA's futility exception for the claims redressable by the IDEA. See Polera, 288 F.3d at 488 ("Where, as here, a full

52

remedy is available at the time of injury, a disabled student claiming deficiencies in his or her education may not ignore the administrative process, then later sue for damages."); Mark V., 455 F. Supp. 2d at 592 ("The IDEA bars Plaintiffs from circumventing the IDEA's administrative exhaustion requirement by taking claims that could have been brought under the IDEA and repackaging them as claims under some other statute.").

        2.    <u>Money Damages</u>

In the alternative, Plaintiff argues that relief through the IDEA would be futile because Plaintiff seeks only money damages, which are unavailable under the IDEA.  (Dkt. # 37 ¶ 14.)

Most circuits that have ruled on this issue have found that a prayer for money damages is, alone, insufficient to bypass the IDEA's exhaustion requirement. E.g., Polera, 288 F.3d at 488; Frazier, 276 F.3d at 64; Covington, 205 F.3d at 917; N.B. v. Alachua Cnty. Sch. Bd., 84 F.3d 1376, 1379 (11th Cir. 1996); see also Charlie F. ex rel. Neil F. v. Bd. of Educ. of Skokie Sch. Dist. 68, 98 F.3d 989, 991 (7th Cir. 1996) (dismissing the argument that, because the suit sought money damages, relief was not "available" under the IDEA).

In Stewart v. Waco Independent School District, the Fifth Circuit spoke clearly on this issue: "[W]e agree that merely demanding monetary damages— which are unavailable under the IDEA—does not automatically remove a claim

from the IDEA's ambit. . . . Plaintiffs therefore generally cannot insulate claims for monetary damages from administrative review by 'artful pleading' if the damages would be used to obtain the same compensatory or other services 'also available under' the IDEA."  711 F.3d 513, 527 (5th Cir. 2013), vacated and remanded, --- F. App'x ----, 2013 WL 2398860 (5th Cir. June 3, 2013).

Although the Fifth Circuit subsequently vacated the opinion, leaving the issue undecided and its prior decision unbinding on this Court, the holding comports with years of case law out of the Fifth Circuit's courts.  See Doe v. E. Baton Rouge Parish Sch. Bd., 121 F.3d 705, at *1 (5th Cir. 1997) (affirming district court's dismissal of a § 1983 suit claiming money damages because a remedy was available under the IDEA and exhaustion was required); Oliver v. Dall. Indep. Sch. Dist., No. 3:01-CV-2627, 2004 WL 1800878, at *5 (N.D. Tex. Aug. 11, 2004) ("[T]he Court concludes that the lack of availability of money damages does not render meaningless the IDEA's exhaustion requirement."); Comeaux v. Tanipahoa Parish Sch. Bd., No. Civ. A. 00-2836, 2001 WL 175230, at *2 (E.D. La. Feb. 20, 2001) (discussing the Fifth Circuit's affirmation of a case that found "'plaintiffs should not be able to skirt [the IDEA] process simply by voluntarily limiting their remedies and then protesting that the process would be futile or inadequate'" in a suit seeking monetary damages, other equitable relief, and attorney's fees).  But see R.J. v. McKinney Indep. Sch. Dist., No. 4:05-CV-257, 2005 WL 3576839, at * 7

(E.D. Tex. Dec. 29, 2005) ("As monetary relief is not available under the IDEA, and as Plaintiffs have exhausted their administrative remedies with respect to their IDEA claim, the Court finds that Defendant's motion to dismiss for failure to exhaust administrative remedies should be denied.")

This Court finds the reasoning of this substantial line of cases persuasive and holds that the mere request for money damages does not render the IDEA's exhaustion requirement futile for Plaintiff.

Accordingly, the child find claims under § 504 of the Rehabilitation Act and the claims under the ADA are barred by the IDEA's exhaustion requirement, and the Court **GRANTS** Defendant's Motion for Summary Judgment with regard to those claims.

IV.    Plaintiff's Remaining Rehabilitation Act Claim

Plaintiff's remaining claim alleges that Defendant failed to keep him safe from harm and failed to provide him an environment that was not injurious to his physical well-being in violation of § 504 of the Rehabilitation Act.  (Dkt. # 22 ¶ 125.)  Defendant argues that, even viewing the facts in the light most favorable to the Plaintiff, there is no evidence of bad faith or gross professional misjudgment, as required to show disability discrimination under the Rehabilitation Act.  (Mot. at 19–20.)

To make out a claim of disability discrimination under § 504 of the Rehabilitation Act, a plaintiff must show that (1) he is a qualified individual, (2) the school district excluded him from participation in, or denied him its benefits services, programs, or activities, or otherwise discriminated against him, and (3) the exclusion, denial of benefits, or discrimination is because of his disability. Lightbourn, 118 F.3d at 428 (listing the elements for an ADA claim of discrimination); D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist., 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability standards under § 504 and the ADA, we evaluate [] claims under the statutes together.").

To prove the second element, the plaintiff must show that the defendant intentionally discriminated against him by presenting facts that create an inference of bad faith or gross professional misjudgment.  D.A. ex rel. Latasha A., 629 F.3d at 454–55.  This is because § 504 does not create general tort liability for educational malpractice, and courts must be careful not to substitute their "own judgment for educational decisions made by state officials."  Id.

Plaintiff points to standards of care set by the Texas Legislature, the University Interscholastic League, and the Marble Falls School Board's policies and procedures to show that Defendant grossly deviated from professional standards of care.  (Dkt. # 37 ¶ 68.)  More specifically, he points to UIL and School District rules, which dictate that coaches and athletic trainers must be trained and follow

applicable law.  (Id. at 9–10.)  Plaintiff identifies the following provisions of the

Texas Education Code as applicable law: Section 33.202, which dictates that the

coach and trainer must complete a safety training program with specific training in

concussions and head injuries and that the District must provide an annual safety

drill on the issues for athletes; Section 33.204, which prohibits athletic staff from

encouraging or permitting students to engage in unreasonably dangerous athletic

techniques; Section 33.205, which requires that coaches and trainers ensure players

are adequately hydrated; and Section 33.206, which requires that the District

maintains records on fulfillment of those requirements.  (Id. at 8–9.)

   Even viewing the evidence in the light most favorable to Plaintiff, there

is no evidence that the District acted with bad faith or gross professional

misjudgment with regard to Ripple's physical safety.  According to Plaintiff, his

doctors cleared him annually to play to football.  The coaching staff never sent

Plaintiff back onto the field during the game when he sustained the injuries he

complained of.  The only concussion that Plaintiff informed the athletic team about

was the one he sustained after the Lampasas game; he avoided reporting and seeking

treatment for his concussive symptoms thereafter in an attempt to remain

competitive for college scholarships.  During the incident in Plaintiff's Senior year

when Plaintiff became severely dehydrated and began bleeding out of his nose and

ears, Plaintiff attests that the coaching team gave the team water breaks.

Although there may be a question of fact as to whether failing to fit Ripple's helmet at the start of his Junior season or failing to affirmatively identify signs of concussions through Ripple's behavior rises to the level of negligence, the facts do not present a question of fact as to whether Defendant acted in bad faith or with gross professional misjudgment.  Accordingly, the Court **GRANTS** Defendant's Motion regarding the § 504 claims.

<u>CONCLUSION</u>

For reasons stated herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 31).  In accordance with this ruling, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Objections to Plaintiff's Evidence in Opposition to Defendant's Motion for Summary Judgment (Dkt. # 39).

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, March 27, 2015.